[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-11879
Non-Argument Calendar
_____

D.C. Docket No. 4:12-cr-00002-RH-CAS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JEAN THERVE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(August 20, 2014)

Before JORDAN, ROSENBAUM, and ANDERSON, Circuit Judges.

PER CURIAM:

Jean Therve appeals his conviction for bribery of a public official, in violation of 18 U.S.C. §§ 2 and 201(b)(1)(C), for which he was sentenced to 33 months' imprisonment. There were two trials in this case. At the first trial, the

district court declared a mistrial after the jury was unable to agree on a unanimous verdict, with all but one juror in favor of finding Therve not guilty. On retrial, the jury returned a verdict of guilty. In this appeal, Therve argues that the district court abused its discretion in declaring a mistrial at his first trial. Upon review of the record and the parties' briefs, we conclude that the court exercised sound discretion in declaring a mistrial and therefore affirm.

## I.

Therve was indicted for bribing an Immigration and Customs Enforcement deportation officer to release him from detention and to prevent his deportation to Haiti. Therve pled not guilty.

The first jury trial was held over two days in November 2012. On November 5, 2012, the jury was empaneled and sworn, and the government presented its case in chief. The government based its case on the testimony of the deportation officer whom Therve allegedly bribed and on recordings of their conversations, and the defense rested without presenting any witnesses.

On the morning of November 6, 2012, the district court instructed the jury, cautioning that "[i]n any message or question you send, you should not tell me your numerical division at the time." The jury began its deliberations at 9:31 a.m. At 11:13 a.m., the court informed the parties of the following note from the jury: "It does not appear that we will reach a unanimous decision. The majority is one

sided, but I don't think we will be unanimous. We are hung. What's next?" The court opined that although the jury might have a good idea of whether it would be unable to reach unanimity, it was appropriate to give an *Allen*[1] charge to "see if they can come to a unanimous agreement or not." Neither Therve nor the government objected to the giving of the modified *Allen* charge. The court then called in the jury and read the modified *Allen* charge. The jury resumed deliberations at 11:19 a.m.

At 1:07 p.m., the district court informed the parties that "[w]e have a note from the jury that essentially says they're hung, and they're not making any progress and nothing is going to change. Tell me what you would like me to do." The government requested that deliberations continue. Defense counsel initially replied that "a mistrial might be the best course to take." After speaking with Therve, however, defense counsel reversed course, stating that Therve "would like me to ask the court to instruct the jury to continue deliberations as best they can."

In response, the district court revealed more information from the jury note:

> Well, let me tell you a little more about this note and see if this changes anybody's mind. The note says, "We have been 11 to 1 from the beginning. None of the 11 are changing their mind. The one holdout won't change either. We all worked very hard. We just had one holdout. We cannot convince that person to switch."
>
> Does that change your mind?

---

[1] *Allen v. United States*, 164 U.S. 492, 17 S. Ct. 154 (1896).

The government replied that it did not. Defense counsel conferred with Therve and then requested clarification: "[T]he note said they are 11 to 1, and they really don't think there's any chance of a change?"

Because it is integral to understanding Therve's challenge on appeal, we quote at length from the transcript of the discussion leading up to mistrial ruling, beginning with the court's response to defense counsel's clarification question posed above:

> THE COURT: The note says, and I'm leaving out parts, but this is the quote of the part I just went over.
>
> "We have been 11 to 1 from the beginning. None of the 11 are changing their mind. The one holdout won't change either. We all worked very hard. We just had one holdout. We cannot convince that person to switch."
>
> MR. LAMMERS [Defense counsel]: Well, Your Honor, I have discussed this new development with Mr. Therve. At this juncture, it appears that further deliberations would probably be—I've been in these situations before; and, if someone is really that determined, and if they have been that way for this long, I don't think anything is going to move again. So we would not object if the court wanted to declare a mistrial.
>
> THE COURT: Maybe it helps at this point if I read you the part I left out.
>
> MR. LINDSEY [Government counsel]: Yes, sir.
>
> THE COURT: "We have been 11 to 1 in favor of not guilty from the beginning. None of the 11 are changing their mind for guilty. The one holdout won't change either to reasonable

4

doubt. We all worked very hard. We just had one holdout. We cannot convince him to switch."

Mr. Lindsey, does that change your mind?

MR. LINDSEY: Yes, sir, it does.

THE COURT: I thought it might.

Mr. Lammers, it probably changes your mind, too.

MR. LAMMERS: Yes, it does, Your Honor. We would like resolution. Naturally, everyone would like resolution of this matter. I would like—I'd ask the court to perhaps read the charge again to the jury.

THE COURT: Look, they have been deliberating not a terribly long time; but, as I think I said at an earlier point, this is not a complicated case. They sat through the whole trial. . . .

I think Mr. Lammers had it right before I told you which way the 11 to 1 was. I think they've done it. They've tried it. Frankly, I would not have been surprised after the first Allen charge if they worked 15 more minutes and said, 'Look, we're not going anywhere.' I think they're probably telling me the truth. They've got one person that's not going to say not guilty, and we can keep them back there, but I don't think it's going to change.

. . .

I also have done this a lot of times. I have had a lot of juries tell me we can't agree, and I've given that Modified Allen Charge, and they've gone back, and they've deliberated, and I got a verdict. I don't think I've ever made anybody keep deliberating after they told me they were hung, and I gave them an Allen charge, and they came back and said, "We tried again, we're really hung, we'll never get an agreement." There comes a point where I don't want to coerce somebody, but my practice consistently is this: I don't make people stay late. I always tell

5

them you can stay as late [as] you want, or you can go home and come back in the morning. If you want to stay, we'll buy you dinner. I leave it up to them. I never try to strong arm a jury into getting a verdict. I don't think it's fair to either side.

Now, we told these folks, don't tell us which your division is or who is ahead, and they did. But before I told you what they said about the split, after talking with Mr. Therve you said, okay, well, if it's 11 to 1, send them home. I think that was—I think that's the right call.

The district court called in the jury and questioned the foreperson, who responded that the jury was never going to reach a unanimous verdict. Then the district court declared a mistrial "because the jury [was] unable to return a unanimous verdict," and it discharged the jury.

Therve's second trial was held in December 2012. The jury found him guilty, and the district court imposed a sentence of 33 months' imprisonment. Therve now brings this appeal. Primarily, Therve argues that the district court failed to exercise sound discretion when it disclosed to the parties the numerical division of the jurors and how they voted. He argues that the disclosure manipulated the parties' discussion about what course of action to take to resolve the issue of the deadlocked jury. Ordering a mistrial in these circumstances, he asserts, necessarily favored the government.

**II.**

We review a mistrial order to determine whether it was manifestly necessary under all of the circumstances. *United States v. Berroa*, 374 F.3d 1053, 1056 (11th

6

Cir. 2004).  The deference we give to the district court's declaration of a mistrial varies according to the circumstances, which include "the basis for the order of mistrial and the trial judge's exercise of sound discretion in making the decision." *Id.*; *see Arizona v. Washington*, 434 U.S. 497, 509-10 & fn.28, 98 S. Ct. 824 (1978).  "To determine if a mistrial was manifestly necessary in a particular case, we review the entire record in the case without limiting ourselves to the actual findings of the trial court."  *United States v. Chica*, 14 F.3d 1527, 1531 (11th Cir. 1994) (quotation marks and alteration omitted).

## III.

The Double Jeopardy Clause of the Fifth Amendment protects a criminal defendant from being subjected to multiple prosecutions for the same offense. U.S. Const. amend. V.  Jeopardy attaches when the jury is empaneled and sworn. *Chica*, 14 F.3d at 1531.  Once jeopardy attaches, a defendant has a constitutional right to have his case decided by that jury, except under limited circumstances.  *Id.*; *see United States v. Jorn*, 400 U.S. 470, 484, 91 S. Ct. 547 (1971).

Nevertheless, a "defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." *Berroa*, 374 F.3d at 1057 (quoting *Wade v. Hunter*, 336 U.S. 684, 689, 69 S. Ct. 834 (1949)).  The doctrine of "manifest necessity" was designed to accommodate these often conflicting

7

interests. *Chica*, 14 F.3d at 1531. Under this doctrine, district courts are permitted to declare a mistrial and discharge a jury only where, "taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." *United States v. Perez*, 22 U.S. (9 Wheat.) 579 (1824).

Whether manifest necessity exists is a fact-intensive inquiry. *Chica*, 14 F.3d at 1531. Because of the "varying and often unique situations arising during the course of a criminal trial," *Illinois v. Somerville*, 410 U.S. 458, 462, 93 S. Ct. 1066 (1973), application of the doctrine "is incompatible with a mechanical application of rules and exceptions," *United States v. Gordy*, 526 F.2d 631, 635 (5th Cir. 1976).[2]    To guide appellate review, the Supreme Court has identified the "extremes" of the "spectrum of trial problems which may warrant a mistrial." *Washington*, 434 U.S. at 507-10, 98 S. Ct. 824. At one extreme, the "strictest scrutiny is appropriate" when a mistrial is declared because of the "unavailability of critical prosecution evidence," or when the prosecutor seeks "to achieve a tactical advantage over the accused." *Id.* at 508, 98 S. Ct. 824. By contrast, a decision to declare a mistrial based on the trial court's belief that the jury is unable to reach a verdict—the "classic basis for a proper mistrial"—generally is "accorded great deference." *Id.* at 509-10, 98 S. Ct. 824.

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), this Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981.

The justification for deferring to the trial court's declaration of a mistrial in these circumstances is that "the trial court is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just verdict if it continues to deliberate." *Id.* at 510 fn.28, 98 S. Ct. 824. Without such deference, "trial judges might otherwise 'employ coercive means to break the apparent deadlock,' thereby creating a 'significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors.'" *Renico v. Lett*, 559 U.S. 766, 774, 130 S. Ct. 1855 (2010) (quoting *Washington*, 434 U.S. at 509-10, 98 S. Ct. 824); *Berroa*, 374 F.3d at 1059.

Even when the trial court generally would be accorded deference, the court nonetheless must exercise "sound discretion" in declaring a mistrial and cannot act "irrationally or irresponsibly." *Washington*, 434 U.S. at 514-16, 98 S. Ct. 824; *see also Grandberry v. Bonner*, 653 F.2d 1010, 1014 (5th Cir. Aug. 1981) (trial court must carefully consider the alternatives and "not act in an abrupt, erratic or precipitate manner"). For instance, the court generally must give the parties a "full opportunity to explain their positions" and "accord[] careful consideration to [the defendant's] interest in having the trial concluded in a single proceeding." *Washington*, 434 U.S. at 515-16, 98 S. Ct. 824; *see also* Fed. R. Crim. P. 26.3 ("Before ordering a mistrial, the court must give each defendant and the

9

government an opportunity to comment on the propriety of the order, to state whether that party consents or objects, and to suggest alternatives.").

Because the trial judge here declared a mistrial based on the jury's inability to agree on a unanimous verdict, "the classic basis for a proper mistrial," the judge's decision is entitled to our deference unless the court failed to exercise "sound discretion."

We begin by acknowledging that the trial judge found himself in a difficult position when he received the jury's second note, even though he had done nothing to precipitate the jury's disclosure of its division and, in fact, had expressly warned the jury not to make such a disclosure. We can also fully understand the judge's urge to disclose the entirety of the contents of the note to the parties before determining how to proceed, particularly in the heat of trial. Nevertheless, upon reflection, we think that the better way to handle this situation is not to disclose any information regarding the division other than that the jury considers itself deadlocked, that the jury has disclosed the numerical division and, if applicable, the positional division, but that the court will not share that information with the parties. *See, e.g.*, *United States v. Warren*, 594 F.2d 1046, 1049 (5th Cir. 1979) (stating that a trial judge "should not disclose the numerical division of the jury"). The jury's numerical division has never been a factor that the Supreme Court or this Court has indicated is an appropriate consideration for determining whether

10

manifest necessity for a mistrial exists.  Nor should it be.  The number of jurors holding out is simply not relevant to determining whether requiring a jury to go back and deliberate further after being told to do so already and being *Allen* charged is coercive.

Nevertheless, while we would prefer that, in the future, judges refrain from announcing the details of splits volunteered by the jury, we cannot say that, in this case, the judge's disclosure of the jury's numerical and positional breakdown somehow rendered improper what was otherwise an appropriate exercise of discretion in declaring a mistrial.  The trial judge discussed the following factors leading up to his mistrial ruling in this case: (1) the jury had deliberated to deadlock in two separate periods of deliberation, including one after receiving an *Allen* charge; (2) despite the two periods of deliberation, the jury said that it had been split in the same way since the very beginning; (3) the judge believed the jury to be truthful in its assessment that it was hung; (4) the trial was short and straight-forward; and (5) the judge suggested that he thought that making the jury continue to deliberate after the second note following the *Allen* charge was coercive.  Based on these findings, the judge reasonably could have concluded that further deliberations would not have proved helpful and that sending the jury back again could have been coercive.  *See United States v. Starling*, 571 F.2d 934, 938-39 (5th Cir. 1978); *Gordy*, 526 F.2d at 636.

11

Moreover, our review of the record in this case, which we explain below, amply supports the trial judge's reasoning and his ultimate decision to exercise his discretion to declare a mistrial. *See Chica*, 14 F.3d at 1531 (explaining that our review is not limited to the trial judge's findings); *Washington*, 434 U.S. at 510 fn.28, 98 S. Ct. 824 (indicating that a trial judge may abuse his discretion if he "acts for reasons completely unrelated to the trial problem which purport[ed] to be the basis for the mistrial ruling").

Significantly, the jury clearly and consistently communicated to the judge that it would not be able to come to a unanimous verdict. *See Gordy*, 526 F.2d at 635-36 ("[T]he trial judge's communications with the jurors are particularly significant."). The jury's first note indicated that it was "hung," that the majority was one-sided, and that it did not appear the jury would reach a unanimous decision. After the *Allen* charge and an additional period of deliberation, the jury returned with a second note stating that it had been "11 to 1 from the beginning," and that, despite "work[ing] very hard," no juror was changing his or her mind. Assuming the truth of the jury notes, which we have no reason to doubt, the jurors' positions did not change since the beginning of deliberations. The jury foreperson later confirmed his view that there was never going to be a unanimous verdict.

Although the period of deliberations was relatively short—less than a total of four hours—the first trial was itself only a single day, it was not complex, and

the jury did not have to reconcile conflicting evidence or testimony because only one witness testified.  Furthermore, Therve's defense was straightforward: due to language barriers (Therve's primary language is Creole), the deportation officer misinterpreted his request for release on bond as an attempted bribe.  Accordingly, the judge appropriately considered the straightforward nature of the trial as a factor supporting a finding of manifest necessity for a mistrial.

Furthermore, we defer to the trial judge's determination that directing the jury to continue to deliberate would have been coercive in the circumstances.  Considering that the judge already had given an *Allen* charge without effect, again directing the jury to continue deliberations risked obtaining a verdict that was not the product of the considered judgment of all jurors.  *See Berroa*, 374 F.3d at 1059.  "Avoiding such improper verdicts is a fundamental underpinning of the great deference we accord to a trial judge's finding that the jury is deadlocked and to the order of mistrial."  *Id.*  Indeed, the potential for coercion arguably was greater in this case because the jury voluntarily disclosed its division to the judge.  *See United States v. Brokemond*, 959 F.2d 206, 210 (11th Cir. 1992) (acknowledging that giving an *Allen* charge after a jury voluntarily discloses its division may be coercive); *United States v. Norton*, 867 F.2d 1354, 1365-66 (11th Cir. 1989) (same).  Thus, the absence of any reasonable alternatives to mistrial reinforces the soundness of the judge's decision.

13

In addition, the judge gave the parties an opportunity to explain their positions and make suggestions. Therve does not contend that the judge failed to consult with the parties but rather that he manipulated the discussion by slowly disclosing the contents of the second jury note. At the time that the judge received the second note, however, the only remaining alternative to mistrial was to direct the jury to continue to deliberate, whether after an additional *Allen* charge or after reinstructing the jury on the offense. Due to the lack of alternatives, we attribute little significance to the fact that the judge's disclosure of the jury division caused the parties to shift their positions on how to proceed. As *Berroa* explained, the judge's consultation with the parties is just one factor to consider in evaluating whether a mistrial ruling was sound, and even a failure to consult at all does not show that the judge abused his discretion when the rest of the record is to the contrary. *See Berroa*, 374 F.3d at 1058-60 (affirming a declaration of mistrial despite the court's failure to consult with the parties at all as required by Rule 26.3, Fed. R. Crim. P.).

The record in this case is clear that the jury was deadlocked and that further deliberations would not have proved helpful. This is the "classic basis" for a proper mistrial. In addition, the trial judge considered the limited alternatives available and consulted with the parties before declaring a mistrial. Despite the disclosure of the jury's division, nothing in the record supports the conclusion that,

14

in declaring a mistrial, the judge acted irrationally or irresponsibly or for reasons unrelated to the jury deadlock. Accordingly, the judge properly exercised his discretion to declare a mistrial based on the jury's inability to agree unanimously.

Finally, we disagree with Therve's contention that the district court's ruling is contrary to the Supreme Court's decision in *Gori v. United States* because "its mistrial order necessarily favored the Government." *Gori* suggested that a trial judge may abuse his discretion in the "hypothetical situation[]" "in which a judge exercises his authority to help the prosecution, at a trial in which its case is going badly." *Gori v. United States*, 367 U.S. 364, 369, 81 S. Ct. 1523 (1961). *Washington* elaborated on this same point, indicating that a judge should not grant a mistrial when "critical prosecution evidence" is unavailable or when the prosecutor seeks "to achieve a tactical advantage over the accused." *Washington*, 434 U.S. at 507-10, 98 S. Ct. 824. Nothing of the sort occurred in this case, which instead involved only a deadlocked jury, the "classic example" of when manifest necessity exists to permit a declaration of mistrial. *See Renico*, 559 U.S. at 774, 130 S. Ct. 1855 (citing *Downum v. United States*, 372 U.S. 734, 736, 83 S. Ct. 1033 (1963)). Nor did the trial judge or the prosecution engage in any bad-faith conduct, or even do anything arguably wrong, to trigger the jury deadlock. While it is true that the mistrial ruling ultimately favored the government, nothing in the

15

record supports the conclusion that that was either the genesis of or the basis for the court's ruling.  Consequently, our decision is not contrary to *Gori*.

## IV.

In sum, after considering the entirety of the circumstances, we hold that the district court exercised sound discretion in finding that the jury would be unable to reach a just verdict if it continued to deliberate, and we defer to the court's implicit finding of manifest necessity for a mistrial.  Accordingly, we affirm the district court's declaration of mistrial and therefore affirm Therve's conviction.

**AFFIRMED.**