[PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 21-10809

————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

CLARK DOWNS,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 5:19-cr-00039-TKW-MJF-1

————————————————

Before JORDAN, ROSENBAUM, and NEWSOM, Circuit Judges.

NEWSOM, Circuit Judge:

We withdraw the opinion issued on January 6, 2023 and issue this opinion in its place.

Clark Downs was convicted of producing and possessing child pornography in violation, respectively, of 18 U.S.C. §§ 2251(a) and 2252A(a)(5)(b). On appeal, he challenges his convictions on three grounds. First, he argues that the government failed to present sufficient evidence to satisfy § 2251(a)'s interstate-commerce element. Second, he contends that the district court reversibly erred when it discharged an impaneled-but-not-yet-sworn jury in his absence. Third, he asserts that the evidence was legally insufficient to establish production under § 2251(a) because of what he calls a "factual impossibility." After careful consideration, we affirm Downs's convictions.

## I

Downs was indicted in the Northern District of Florida for producing and possessing child pornography. Of particular relevance to this appeal is the production statute, which, in pertinent part, provides as follows:

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction

> of such conduct, shall be punished . . . if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer . . . .

18 U.S.C. § 2251(a).

Downs's trial was slated to begin in September 2020 in Pensacola, Florida. Early during the week of September 14, the district judge impaneled a jury. The judge and both parties agreed, however, not to swear the jury because a tropical storm that had been brewing in the Gulf of Mexico was soon set to make landfall. As it turned out, by the time the storm reached Pensacola, it had become a Category 2 hurricane, and it flooded downtown, disrupted internet service, and downed telephone lines and bridges in the area surrounding the courthouse.

Shortly after the storm passed, the judge scheduled a teleconference to discuss next steps. Downs was not present at the conference, in part because the internet and telephone lines at his prison facility were down. During the conference, the judge informed the parties that he intended to continue the trial for three weeks. He planned to contact the as-yet unsworn jurors to ask whether they could accommodate the new trial calendar. If any of the jurors was unavailable for the new trial date, the judge explained, he would dismiss the entire jury and impanel a new one. Downs's lawyer suggested that the judge consider discharging and replacing only the jurors for whom the new trial date wouldn't

work, but the judge declined that suggestion. Instead, per his plan, the judge discharged the entire jury after learning that one of the members couldn't make the new date. Downs unsuccessfully moved the judge to reconsider his decision.

The case ultimately went to trial a month and a half later before a new jury, which was impaneled and sworn in the presence of all parties, including Downs. At the trial, Downs's victim, L.H., testified that Downs was a family friend of her mother, L.L. Cox, and L.L.'s husband, Jimmy Cox. Each summer, she said, the Coxes would drive L.L.'s three children to Downs's home in the Florida Panhandle. During one of those trips, when L.H. was 15 years old, Downs asked her to undress and took photos of her using a "flip phone" on at least three occasions. L.H. explained that Downs told her that he later transferred the photos to his home computer.

Several law-enforcement officers testified that they found explicit photos of L.H. on Downs's home computer during their investigation. One of the investigators confirmed that the computer's internal hard drives were manufactured in China and that the external drives were made in Thailand. Subsequent forensic analysis revealed that the photos found on the hard drives were taken with a Samsung SCH-S738C model cell phone. On cross-examination, the same investigator admitted that he didn't know whether that particular model was a flip phone, and no testimony was elicited regarding where the Samsung was manufactured.

Following the prosecution's case-in-chief, Downs moved for judgment of acquittal, arguing that the government had failed to present sufficient evidence to satisfy § 2251(a)'s interstate-commerce element. The district judge denied Downs's motion.

Downs was convicted on both the production and possession counts. The court sentenced him to 300 months' imprisonment on the former and a concurrent term of 120 months' imprisonment on the latter, followed by two concurrent 10-year terms of supervised release.

On appeal, Downs challenges his convictions on three grounds, which we will consider in turn.

## II

Downs first contends that the government presented insufficient evidence to satisfy the production statute's interstate-commerce element. The reason, he says, is because the government introduced no evidence that the Samsung phone with which he took the photos of L.H. ever traveled in interstate commerce. But, of course, the government *did* produce evidence that the hard drives to which Downs transferred the photos were manufactured overseas. The question thus turns on whether the act of transferring the photos from cell phone to hard drive can itself constitute the "produc[tion]" prohibited by § 2251(a).[1]

---

[1] There is some doubt about whether Downs properly preserved his sufficiency-of-the-evidence challenge—and if he didn't, how that failure affects

We begin, as always, with the statute's plain language. Again, § 2251(a) states, in relevant part, that "[a]ny person who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of *producing* any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, shall be punished . . . if that visual depiction was *produced* or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including

---

the standard of review. He contended that the evidence was insufficient to meet the statute's interstate-commerce element, but on a different basis than he argues on appeal. At least one of our cases states that "[w]here the *specific grounds* upon which a defendant made his sufficiency-of-the-evidence challenge at trial differs from those he asserts on appeal, we review under his new theory only for manifest miscarriage of justice." *United States v. Ezquenazi*, 752 F.3d 912, 935 (11th Cir. 2014) (emphasis added). But other decisions suggest that the deferential manifest-miscarriage-of-justice standard applies only where a defendant failed to raise a sufficiency challenge in district court *at all. See, e.g.*, *United States v. Fries*, 725 F.3d 1286, 1291 (11th Cir. 2013) ("[W]here a defendant does not move for acquittal or otherwise preserve an argument regarding the sufficiency of the evidence in the court below, . . . we will reverse the conviction only where doing so is necessary to prevent a manifest miscarriage of justice."); *United States v. Thompson*, 610 F.3d 1335, 1338 (11th Cir. 2010) (per curiam) (applying the manifest-miscarriage-of-justice standard where the defendant never moved for a judgment of acquittal on certain counts at issue on appeal); *United States v. Tagg*, 572 F.3d 1320, 1323 (11th Cir. 2009) (reviewing for manifest miscarriage of justice where "[a]t no time did the defense move for a judgment of acquittal"). We needn't resolve the issue here, because we conclude, for reasons explained in text, that even on the more indulgent de novo standard, Downs's sufficiency challenge fails. *United States v. Diaz*, 248 F.3d 1065, 1084 (11th Cir. 2001).

by computer . . . ."  18 U.S.C. § 2251(a) (emphasis added).  Section 2256(3), in turn, defines the key term "producing" to mean "producing, directing, manufacturing, issuing, publishing, or advertising."  *Id.* § 2256(3).

Based on the statutory text alone, we might be inclined to conclude that a defendant's act of transferring photos from his phone to a hard drive does *not* amount to "producing" them.  That is so for two reasons.  First, none of § 2256(3)'s definitions of the word "producing"—"directing, manufacturing, issuing, publishing, or advertising"—clearly covers the act of transferring photos from one device to another.  Second, § 2251(a) itself targets two different actions—"producing" and "transmitting."  Between the two, the latter would seem to be the more natural linguistic basis for capturing the act of transferring photos.  Here, though, the government hasn't relied on § 2251(a)'s prohibition on "transmi[ssion]," perhaps having assumed that it refers only to "live visual depiction[s]" of the sort not at issue in this case.

For his part, though, Downs seems to concede—or at least not to dispute—that, as used in § 2251(a), the term "producing" *is* properly read to cover the act of transferring photos from phone to hard drive.  *See* Br. of Appellant at 20.  He does so presumably on the ground that our precedent requires as much.  Having carefully considered the issue, we agree.

Although we haven't specifically considered the definition of the term "producing" in the *production* statute, we have examined its meaning in the *possession* statute, 18 U.S.C. § 2252A(a).

Specifically, in *United States v. Maxwell*, we held that the act of copying photos from a phone to an external drive constitutes "produc[tion]" within the meaning of § 2252A(a). *See* 386 F.3d 1042, 1051–52 (11th Cir. 2004), *vacated on other grounds*, 546 U.S. 801 (2005).

We find that *Maxwell* controls here for two reasons. First, the statutory definition of the word "producing" applies to both the possession and production provisions. *See* 18 U.S.C. § 2256(3) (defining "producing" "[f]or the purposes of this chapter," including §§ 2251 and 2252A). And second, the production and possession statutes use the term in fundamentally the same way. *Compare id.* § 2251(a) ("[I]f that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means . . . ."), *with id.* § 2252A(a)(5)(B) ("[C]hild pornography . . . that was produced using materials that have been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means…."). Accordingly, our interpretation of the word "producing" in *Maxwell* to cover the act of transferring a photograph from a phone to an external drive—albeit there with respect to a possession charge—controls our interpretation of the same term here.

For what it's worth, other circuits have come to the same conclusion. In *United States v. Angle*, for instance, the Seventh Circuit held, as we did in *Maxwell*, that the term "producing" in the possession statute covers the act of transferring photos from a phone to an external drive. *See* 234 F.3d 326, 341 (7th Cir. 2000). In

a follow-on case, that court held—as we do today—that the production statute's use of the same § 2256(3)-based definition of the term "producing" meant that it should be understood to reach the act of transferring, as well. *See United States v. Foley*, 740 F.3d 1079, 1083–86 (7th Cir. 2014). Relying heavily on the Seventh Circuit's reasoning in *Foley*, the Second Circuit likewise held in *United States v. Pattee* that the term "producing" in the production statute should be read to include the act of copying photos to a hard drive. *See* 820 F.3d 496, 509–11 (2d Cir. 2016). And finally, even in the absence of *Maxwell-* or *Foley*-like precedent interpreting the possession statute's use of the word "producing," the First Circuit held that the production statute's use of that term covered the act of transferring photos from a phone to an external storage device. *See United States v. Poulin*, 631 F.3d 17, 22 (1st Cir. 2011). Indeed, even the decision on which Downs principally relies, *United States v. Lively*, recognizes "that 'producing' child pornography, as used in § 2251(a), encompasses copying images onto a hard drive." 852 F.3d 549, 560 (6th Cir. 2017).[2]

---

[2] Downs's reliance on *Lively* is misplaced. *Lively* is distinguishable from this case in an important respect. As best we can tell from its opinion, the Sixth Circuit held there that copying photos from a phone to a hard drive did not constitute "production" within the meaning of § 2251(a) where the defendant had abused the child, but *another person* had both taken the photos and then copied them to a hard drive. *Lively*, 852 F.3d at 561. That, the Sixth Circuit seemed to say, was because (1) the "purpose" mens rea element that appears in the statute's first clause must carry through to the interstate-commerce clause, and (2) it doesn't when the defendant neither took nor transferred the

Downs nonetheless insists that the production statute's mens rea element requires that there be an interstate-commerce connection at the moment of initial creation. Recall that the statute requires that the offender "employ[], use[], persuade[], induce[], entice[], or coerce[] any minor to engage in . . . any sexually explicit conduct *for the purpose of producing* any visual depiction of such conduct" if that depiction was "produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce." 18 U.S.C. § 2251(a) (emphasis added). From that language, Downs reasons that the interstate-commerce element "must be satisfied by an examination of the means or materials used at the point in time of the original production." Br. of Appellant at 15.

Downs's argument, though, can't survive his concession—or at the very least, his failure to contest—that the transfer of photos from a phone to a hard drive constitutes "produc[tion]." From that starting point, our decision in *United States v. Grzybowicz*, 747 F.3d 1296 (11th Cir. 2014), resolves the interstate-commerce issue. There, we interpreted the statutory language of the production statute to mean that "[t]he interstate commerce element . . . is satisfied by proof that the child pornography . . . was *produced* using materials that had been transported in interstate or foreign commerce." *Id.* at 1306 (emphasis added). If, as all here seem to agree under *Maxwell*, the transfer of the photos to the hard drive

photos. *Id.* at 562–63. Here, of course, one person—Downs—abused the child, took the photos, and downloaded them to a hard drive.

constitutes the required "produc[tion]," and if, as the evidence shows, the hard drives were manufactured overseas, then the necessary nexus exists between the actionable "produc[tion]" and interstate commerce.

To the extent that Downs means to argue that there was insufficient evidence to demonstrate that, at the time he originally captured the pornographic photos on his phone, he intended to transfer them to his computer, we disagree for two reasons. First, based on our decision in *Maxwell*—and our sister circuits' similar decisions in *Foley*, *Pattee*, and *Poulin*—we reject the premises (1) that "produc[tion]" is limited to the moment of an image's initial creation and (2) that a defendant's intent must therefore be assessed at that time. Second, and in any event, when viewed in the light most favorable to the government, the evidence defeats Downs's contention. The proof at trial showed (1) that investigators found pornography of L.H., as well as illicit photos of other children, on Downs's computer; (2) that Downs sexually abused L.H. and took nude photos of her in his car, on the beach, and in motel rooms when she was only 15 years old; (3) that Downs would drive for more than an hour in some cases to abuse L.H., presumably so that no one else—most notably her family—would be around when he did; and (4) that Downs transferred the photos he took of L.H. from his phone to his home computer, and had in fact told L.H. as much. From that evidence, a jury could have reasonably concluded that Downs had the requisite intent to "produce" child pornography when he originally captured the photos of L.H.

### III

Downs separately contends that the district court reversibly erred when it discharged the impaneled-but-as-yet-unsworn jury in his absence. Downs makes two arguments in this regard: first, that the district court judge shouldn't have dismissed the entire panel; and second, regardless whether that decision was proper, that Downs should have been present when the decision was made. We'll take Downs's arguments in turn.

### A

A defendant only has the right to have his case decided by a particular jury once jeopardy attaches. *United States v. Therve*, 764 F.3d 1293, 1298 (11th Cir. 2014). Jeopardy doesn't attach until a jury is both impaneled and sworn. *Id.*

Here, Downs's initial jury was impaneled, but not sworn. In fact, the record shows that both parties agreed *not* to swear the jury given the impending storm—and, further, that once the storm had made landfall, Downs's lawyer admitted that he was "glad the jury wasn't sworn" because it gave the court the necessary flexibility to make new trial arrangements. Because the jury wasn't sworn, jeopardy never attached. And absent jeopardy, Downs had no right to have his case decided by the particular jury that the judge had initially impaneled. Accordingly, the district court did not err when it discharged the entire panel.

## B

Downs also argues that he was impermissibly excluded from the conference at which the judge decided to discharge the jury. We have explained that a defendant's right to be present during criminal proceedings stems from "the Confrontation Clause of the Sixth Amendment, the Due Process Clause of the Fifth Amendment, and Federal Rule of Criminal Procedure 43." *United States v. Novaton*, 271 F.3d 968, 997 (11th Cir. 2001). Downs contends that each of those provides a basis for reversal here.

Downs's lawyer didn't object to his client's absence from the teleconference in which the judge decided to discharge the jury. When a party fails to object to his absence from a proceeding, we review only for plain error. *See United States v. Martinez*, 604 F.2d 361, 365 (5th Cir. 1979). We can reverse on plain-error review only if: (1) there was an error; (2) that error was plain; (3) the error affected the defendant's substantial rights; and (4) the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Cingari*, 952 F.3d 1301, 1305 (11th Cir. 2020) (quotation marks omitted).

Downs's constitutional arguments are unavailing because he has failed to show any error—plain or otherwise—under either the Fifth or Sixth Amendment. With respect to the latter, the Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the *witnesses* against him." U.S. Const. amend. VI (emphasis added). Needless to say, there were no "witnesses" at the conference at

which the judge was considering what to do with Downs's impaneled-but-not-yet-sworn jury. And we have held that the Sixth Amendment "does not confer upon the defendant the right to be present at every conference at which a matter pertinent to the case is discussed, or even at every conference with the trial judge at which a matter relevant to the case is discussed." *United States v. Vasquez*, 732 F.2d 846, 848 (11th Cir. 1984). Here, a pretrial meeting about the discharge of an unsworn jury does not implicate the Confrontation Clause.

Downs's Fifth Amendment argument likewise fails. We have assumed that even when the defendant is not confronting witnesses or evidence against him, he has a due-process right "to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Novaton*, 271 F.3d at 998 (quoting *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987)). The government's and defense's cases-in-chief are paradigmatic stages of a criminal proceeding with respect to which the Due Process Clause protects a defendant's right to be on hand. *Id.* The reason, of course, is that at those junctures, a defendant's right to defend against the charges before him is at an apex. Here, by contrast, a judge's decision whether to discharge an unsworn jury in Downs's absence doesn't trigger the same concerns. The discharge decision is not "critical to [the trial's] outcome" because it doesn't interfere with a defendant's ability to defend against the charges before him, nor does the defendant's absence "thwart[]" the fairness of his hearing. *Id.* By all accounts,

Downs was present for all stages of his trial that would implicate his right to a fair and just hearing. That is all the Due Process Clause requires.

Downs's argument under Federal Rule of Criminal Procedure 43, by contrast, has merit. In relevant part, Rule 43 states that "[u]nless this rule, Rule 5, or Rule 10 provides otherwise, the defendant must be present at: (1) the initial appearance, the initial arraignment, and the plea; (2) every trial stage, including jury impanelment and the return of the verdict; and (3) sentencing." Fed. R. Crim. P. 43(a). Accordingly, to determine whether Rule 43 gave Downs a right to be present for the conference at which the judge considered whether to discharge the impaneled-but-not-yet-sworn jury, we must consider two questions. First, is jury discharge a "trial stage" within the meaning of Rule 43(a)(2)? And if so, do any of Rule 43's exceptions apply?

The Rule's language and structure convince us that the answer to the first question is yes—jury discharge *is* a "trial stage." Rule 43(a) subdivides district-court proceedings into three phases: pre-trial, in subsection (1); trial, in subsection (2); and post-trial, in subsection (3). Subsection (2)'s language indicates an all-encompassing, "soup-to-nuts" coverage of the trial phase, extending to "*every* trial stage," from "jury impanelment" at the very beginning of trial to "the return of the verdict" at the tail end. If, per the Rule's plain language, jury *impanelment* is a "trial stage" at which a defendant has a right to be present, it seems clear enough

that any necessarily subsequent (but pre-verdict) jury *discharge* is, too.

Resolution of the issue thus turns on whether any of Rule 43's "unless"-based exceptions applies. None does. Neither Rule 5 nor Rule 10 has any relevance here—the former applies to the initial appearance, and the latter to the arraignment. Nor do any of the exceptions specified in "this Rule"—*i.e.*, Rule 43 itself—exempt the jury-discharge conference at issue. Rule 43(b) specifies four "circumstances" in which the defendant's presence is "[n]ot [r]equired," but the only one of those that could even arguably apply here is where "[t]he proceeding involves only a conference or hearing on a question of law." Fed. R. Crim. P. 43(b)(3). But a review of the transcript from the jury-discharge conference reveals that the parties and the judge never discussed any "question[s] of law"; to the contrary, their discussion focused entirely on the practical difficulties posed by the hurricane.

Because jury discharge is a "trial stage" within the meaning of Rule 43(a)(2), and because none of Rule 43's exceptions applies, we hold that Downs had a right to be present when the impaneled-but-not-yet-sworn jury was discharged. Accordingly, his absence from that conference constitutes error—and we think plain error—under Rule 43. Even so, Downs must show that the error affected his substantial rights. *Cingari*, 952 F.3d at 1305. For three reasons, he can't do so. First, Downs's lawyer was present and represented his interests when the judge decided to discharge the jury. At the conference, Downs's counsel suggested an alternative to

discharging the entire jury panel, which the judge summarily rejected.  Moreover, the transcript makes clear that no matter what argument Downs's lawyer made, the judge intended to discharge the entire jury if even a single member wouldn't be available at the later date.  Even now, having presumably consulted with his client, Downs's lawyer doesn't offer any new arguments against discharging the jury.  So, it seems clear enough that Downs's presence wouldn't have made a difference to the ultimate outcome.

Second, Downs only "speculate[s] as to whether the replaced juror[s] may have been more favorably disposed to [him] . . . ." *United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003).  We require more for reversal than bald assertions that a different jury would have reached a different verdict.  Accordingly, Downs has not shown that the error affected his substantial rights.  *Id.*

Finally, the action that the judge took after discharging the initial jury is the very action that would have been required to remedy a Rule 43 violation—namely, impaneling a new jury.  So even if Downs could show that his presence would have changed the judge's decision to dismiss the jury, the judge's subsequent impaneling of a proper jury cures any potential harm.

## IV

Lastly, Downs contends that the government's evidence was legally insufficient due to what he calls a "factual impossibility."  As already explained, at trial, L.H. testified that Downs took photos of her in a state of undress using a "flip phone."  Subsequent testimony

from a forensic analyst revealed that the photos were taken with a Samsung SCH-S738C.  On appeal, Downs asserts that a Samsung SCH-S738C isn't a flip phone and can't be confused with one.  He argues, therefore, that L.H.'s testimony was factually impossible, leaving the evidence legally insufficient for conviction.  We review only for plain error because Downs didn't raise factual impossibility as a basis for granting his motion for judgment of acquittal.  *See United States v. Hunerlach*, 197 F.3d 1059, 1068 (11th Cir. 1999).

With respect, Downs misunderstands factual impossibility. "Factual impossibility occurs when the objective of the defendant is proscribed by the criminal law but a circumstance unknown to the actor prevents him from bringing about that objective."  *United States v. Delgado*, 321 F.3d 1338, 1346 (11th Cir. 2003) (citations omitted).  That isn't Downs's contention, and for good reason: Using a flip- (or non-flip-) phone doesn't make the production of child pornography impossible.  Instead, Downs insists that a discrepancy in the evidence—about whether or not he used a flip-phone to take the photos—fatally undermines the jury's verdict.  At worst, that's a factual *ambiguity*, not a factual *impossibility*.

Credibility questions are the exclusive province of the jury, and on sufficiency review we must assume that they were answered in a manner that supports the verdict, *see United States v. Jiminez*, 564 F.3d 1280, 1285 (11th Cir. 2009), unless witness testimony is "unbelievable" as a matter of law, *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002).  Here, L.H. testified that the photos were taken with a flip phone, and the forensic analyst stated

that the photos were taken with a Samsung SCH-S738C.  No testimony was elicited as to whether that Samsung model was or was not a flip phone.  The jury was entitled to resolve that evidentiary ambiguity.[3]

★  ★  ★

For the foregoing reasons, we affirm Downs's convictions.

**AFFIRMED.**

---

[3] And to be clear, the jury heard evidence from which it could have reconciled any perceived inconsistency.  The testimony revealed, for instance, that L.H. was drunk at the time that Downs took the pictures of her, and four years had elapsed between the time that Downs took the photos and the time that L.H. reported the event to law enforcement.  Accordingly, the jury could have concluded that L.H. was simply confused about the type of phone that Downs had used.  Separately, the jury heard testimony that investigators found a flip phone at Downs's residence, from which it could have adduced that L.H. remembered that Downs used a flip phone at times and just misremembered the precise details about the time when he took pictures of her.