[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-12800

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ISHMYWEL CALID GREGORY,
HENDARIUS LAMAR ARCHIE,
ROLANDO ANTUAIN WILLIAMSON,
ADRIEN HIRAM TAYLOR,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Alabama

2                Opinion of the Court                22-12800

D.C. Docket No. 2:19-cr-00466-ACA-JHE-9

_____

_____

No. 22-12809

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

HENDARIUS LAMAR ARCHIE,
a.k.a. Hen,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Alabama
D.C. Docket Nos. 2:20-cr-00151-ACA-JHE-1,
2:19-cr-00466-ACA-JHE-17

_____

_____

No. 22-12843

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ROLANDO ANTUAIN WILLIAMSON,
a.k.a. Baldhead,
a.k.a. Ball Head,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:20-cr-00405-ACA-JHE-1

_____

Before JORDAN, NEWSOM, and BRASHER, Circuit Judges.

BRASHER, Circuit Judge:

Rolando Williamson, Hendarius Archie, Ishmywel Gregory, and Adrien Taylor appeal their convictions concerning several drug distribution and conspiracy charges. Williamson argues, among other things, that the district court erred in denying his motions to suppress the results of warrants to search a house and apartment. Probable cause for the warrant to search the house was

based, in part, on evidence gathered by pole cameras positioned outside it. He contends that the warrantless use of these pole cameras—when focused on his home and recording non-stop—violated the Fourth Amendment. Archie argues that the district court erred in allowing improper opinion testimony from a case agent. Gregory challenges the district court's finding as to the type and amount of drugs attributable to him at sentencing. And each defendant challenges the sufficiency of the evidence supporting his respective conspiracy conviction.

We conclude that only Williamson and Gregory have meritorious arguments. As to the pole cameras, we hold that their use did not violate Williamson's Fourth Amendment rights. The pole cameras surveilled areas exposed to the public, and the fact that they recorded non-stop is of little relevance—the Constitution does not forbid the government from using technology to conduct lawful investigations more efficiently. We conclude that the case agent's challenged opinion testimony—proper or improper—did not affect Archie's substantial rights because the testimony concerned the distribution of methamphetamine and Archie was convicted only of the distribution of marijuana. We hold, after a thorough review of the record, that the evidence was sufficient as to each defendant's conspiracy conviction. But, because conspiracy is a lesser included offense to Williamson's additional conviction of engaging in a continuing criminal enterprise, Williamson's conspiracy conviction must be vacated. Lastly, in light of the jury's drug-quantity finding, Gregory's sentence of 40 years is above the statutory maximum. Accordingly, we affirm each conviction, except

Williamson's conspiracy conviction, which we vacate, and we affirm each sentence, except Gregory's, which we vacate in its entirety and remand for resentencing, consistent with this opinion.

## I.

### A.

Throughout 2019, the police investigated Rolando Williamson, Ishmywel Gregory, Adrien Taylor, and Hendarius Archie for drug trafficking in and around Birmingham, Alabama. Specifically, the government believed that Williamson, Gregory, Taylor, and Archie were working together to sell heroin, cocaine, meth, and marijuana.

In April of 2019, the government executed a controlled buy between Gregory and a cooperating witness. The witness agreed to purchase half an ounce of cocaine for $650. The government recorded phone calls planning the controlled buy and recorded audio of the controlled buy itself. As a result of this controlled buy, the government applied for and received authorization to intercept communications from Gregory. One such communication concerned Gregory arranging to meet with a person so that Gregory could pay him approximately $30,000 that he owed for meth.

The government also executed two separate controlled buys between Taylor and a confidential source. The first occurred in April of 2019, when the confidential source purchased two ounces of meth from Taylor for $600. The second occurred in June of 2019, when the confidential source purchased three ounces of meth from

Taylor for $870. In between these controlled buys, the government applied for and obtained authorization to intercept communications from Taylor. Several of the intercepted calls concerned drug trafficking, and, in particular, cocaine and meth.

As part of the government's continuing investigation, Agent Wayne Gerhardt used two pole cameras to observe Williamson's home—one overlooking the front of his house and the other overlooking the backyard. Both pole cameras were installed in October of 2018 without a warrant, ran continuously through August of 2019, and recorded soundless footage of activity in their range of vision. The cameras could view only what was visible from the public street in front of the house and the public alley behind it.

A cooperating informant—led by Agent Gerhardt—called Williamson and set up a purchase of narcotics. The purchase took place inside Williamson's home in June of 2019. Agent Gerhardt used pole cameras to record the witness arriving at the premises and an audio recording device—attached to the witness—to record the transaction itself. After meeting with Williamson, the witness exited the home with a sample size of heroin mixed with fentanyl. Agents applied for and obtained authorization to intercept communications from a cell phone used by Williamson.

In August of 2019, officers arrested Williamson. At the time of his arrest, he was in possession of two handguns—one in his car and one on his person—a small amount of marijuana, and approximately $13,968 in cash. The same day, officers executed a search warrant at Williamson's home and recovered digital scales, plastic

bags often used for narcotics, a pistol, ammunition, marijuana inside a suitcase, several bags of marijuana, and meth. To support probable cause for the home warrant, Agent Gerhardt's warrant application relied on pole camera footage, the controlled buy from June of 2019, and subsequent transactions. Specifically, Gerhardt's supporting affidavit provided evidence—detailing, among other things, intercepted phone calls, the contents of collected, abandoned trash, and observations Gerhardt and others had—that Williamson was engaged in drug-related transactions with at least four others during the period between the controlled purchase and the application for the warrant.

About two months later, officers executed a search warrant at Williamson's apartment and recovered 5,700 grams of marijuana, 135 grams of fentanyl and heroin mixed together, four firearms, 1,400 rounds of ammunition, $95,000 in cash, and $45,000 worth of jewelry. They also recovered items bearing Williamson's name, including a passport and plane ticket. The officers supported probable cause for the apartment warrant with an informant's statement that he had observed Williamson storing money and personalized, expensive jewelry in the apartment—specifically, Williamson's $30,000 gold necklace and "RAW" pendant, which he purchased with no known source of income. As with the home warrant's supporting affidavit, the apartment warrant's supporting affidavit detailed intercepted communications concerning drug trafficking and recounted physical surveillance of the residence.

Based in part on pertinent interceptions of Williamson's communications, the government began intercepting Archie's communications and listened for approximately 30 days. Several of those communications concerned drug trafficking. For example, at least two such calls concerned marijuana. Officers eventually arrested Archie at his home. Inside the home, officers found 74.6 grams of marijuana, a handgun, and a digital scale.

*B.*

A grand jury indicted Williamson, Taylor, Gregory, and Archie of multiple counts. Williamson was charged with engaging in a continuing criminal enterprise (Count 1); conspiracy to distribute one kilogram or more of heroin, five kilograms or more of cocaine hydrochloride, 50 grams or more of meth, and 100 kilograms or more of marijuana (Count 2); possession with intent to distribute marijuana (Count 3); the use and carry of a firearm during a drug trafficking crime (Count 4); possession with intent to distribute 100 grams or more of heroin, 500 grams or more of meth, and a detectable amount of marijuana (Count 5); possession with intent to distribute 100 grams or more of heroin, 40 grams or more of fentanyl, and a detectable amount of marijuana (Count 6); possession of a firearm in furtherance of a drug trafficking crime (Count 7); and distribution of heroin and fentanyl (Count 8). Taylor was charged with conspiracy to distribute one kilogram or more of heroin and 50 grams or more of meth (Count 2); distribution of 50 grams or more of meth (Count 11); and distribution of five grams or more of meth (Count 12). Both Williamson and Taylor were

also charged with the use of a communication facility to facilitate drug trafficking crimes (Counts 30–44 and 48–49 for Williamson and 17–29 for Taylor). For his part, Gregory was charged with conspiracy to distribute five kilograms or more of cocaine hydrochloride and 50 grams or more of meth (Count 2) and distribution of cocaine hydrochloride (Count 13). And Archie was charged with conspiracy to distribute one kilogram or more of heroin, five kilograms or more of cocaine hydrochloride, and 100 kilograms or more of marijuana (Count 2).

Later, Williamson and Archie were indicted again in separate cases. Williamson was charged with possession of a firearm in relation to a drug trafficking crime. Archie was charged with possession with the intent to distribute a controlled substance and possession of a firearm in furtherance of a drug trafficking crime.

The defendants were tried jointly and the charges from each separate case were consolidated for trial. At trial, several witnesses testified that they were involved in drug trafficking with the defendants. Isiah Thomas testified that he sold cocaine supplied by Williamson for "five or six" years and that they had been dealing drugs together for even longer. Errick Daniel, Derrick Bland, and Leanthony Gillins lived at Williamson's home and served as "middlemen" alongside Thomas—meaning that Williamson would supply them with drugs that they then sold to others. The government presented evidence that Williamson received kilo quantities of cocaine that he stored at his house, that he had suitcases full of marijuana stored at his apartment, and that he obtained a kilo or two of

heroin monthly for resale from Detroit. Williamson relied on two men—"Shezzy" and "Tuff"—to drive the heroin from Detroit to Birmingham. When others were arrested, Williamson would front them money so that they could obtain legal counsel. Williamson described himself as "everybody's backbone" following his arrest.

The government also presented recordings of five telephone calls that Williamson made. They concern (1) Williamson checking in with Darrius Johnson about his stock of drugs; (2) Williamson confirming with Gillins that Williamson is "gonna still bring it"; (3) Williamson setting up a drug deal with Thomas; (4) Williamson and Johnson discussing the fact that Johnson had been stopped by police and his truck had been searched soon after leaving Williamson's house; and (5) Williamson and Tevion Poole discussing the quality of two different strains of marijuana.

Demarcus Whitt testified that he had been dealing drugs with Gregory since approximately 2017. At first, Whitt was buying meth from Gregory—starting with ounces a few times a week and progressing to kilo quantities. Then in 2019, Gregory lost his source and Whitt began selling him kilos of meth. The government presented evidence that a cooperating witness met with Gregory and purchased cocaine. The transaction was recorded. Other evidence established that Gregory dealt drugs with Isaac Robinson who, in turn, was a source for Williamson, selling him both meth and marijuana.

Thomas testified that he sold Taylor heroin. Likewise, Kenneth Johnson testified that he and Taylor began dealing drugs as

early as 2012, "split up for some years," and then resumed in 2018. Taylor would supply Johnson with meth and heroin that Johnson would then sell to others. Johnson testified that he once saw Taylor with "like a pound" of meth. Both Johnson and Thomas's testimonies were corroborated by either phone calls or text messages. The government also presented evidence that a cooperating witness met with Taylor and purchased meth. The transaction was recorded.

Thomas further testified that Archie was a middleman to whom Williamson supplied three pounds of marijuana once or twice a week. Thomas observed these transactions and testified that they occurred over the course of about two years. The government presented evidence that, when Archie was arrested, he was in possession of 74.6 grams of marijuana, a handgun, and a digital scale. Throughout the investigation, agents intercepted calls between co-conspirators related to drug trafficking, including calls from each defendant.

Agent Gerhardt testified that the phrase "a cup of ice"—as used on a phone call between Archie and another person—referred to "one ounce or one-half ounce quantities of methamphetamine." Agent Gerhardt provided this testimony as a fact witness, not as an expert witness. He explained that his conclusion as to the quantity of meth being discussed was based on the purchase price mentioned during the call and his general knowledge of drug prices. Archie objected that "if they wanted to elicit what a cup was from Agent Gerhardt, that should have come in . . . his expert testimony

that he knew that to be a certain amount or a certain weight." The district court ultimately overruled Archie's objection, concluding that the testimony was admissible as lay testimony.

The district court charged the jury in a manner consistent with the pattern jury instruction. As to Williamson's continuing criminal enterprise count, the district court charged the jury that it must find, among other things, that Williamson engaged in at least three related violations of the federal controlled substances laws with at least five other people. It specified that "it doesn't matter" whether those five persons are named in the superseding indictment or whether the same five participated in each crime or participated at different times. Williamson requested that the jury instruction be amended to include the statement that a "mere buyer-seller relationship will not satisfy this requirement." The district court rejected Williamson's request, finding that the pattern jury instructions already "contemplated" the substance of Williamson's amendment and that going further would run the risk of confusing the jury.

The jury convicted on most counts. It convicted Williamson of engaging in a continuing criminal enterprise (Count 1); conspiracy to distribute or possession with intent to distribute heroin weighing 100 grams or more, meth weighing 50 grams or more, fentanyl weighing 40 grams or more, and marijuana weighing 100 kilograms or more (Count 2); possession with intent to distribute marijuana (Count 3); possession of a firearm in relation to a drug trafficking crime (Count 1 in 2:20-cr-405-ACA-JHE); possession

with intent to distribute 100 grams or more of heroin, 500 grams or more of meth, and marijuana (less than 100 kilograms) (Count 5); possession with intent to distribute 100 grams or more of heroin, 40 grams or more of fentanyl, and marijuana (less than 100 kilograms) (Count 6); possession of a firearm in furtherance of a drug trafficking crime (Count 7); distribution of heroin and fentanyl (Count 8); and the use of a communication facility to facilitate a drug trafficking crime (Counts 34, 35, 39, 40, and 41). It convicted Taylor of distributing meth weighing 50 grams or more (Counts 2 and 11) and meth weighing five grams or more (Count 12)—and the use of a communication facility to commit a drug trafficking crime (Counts 20–22). It convicted Gregory of distributing cocaine weighing less than 500 grams (Counts 2 and 13). And it convicted Archie of conspiracy to distribute marijuana weighing 100 kilograms or more (Count 2); possession with the intent to distribute a controlled substance (Count 1 in 2:20-cr-151-ACA-JHE); and possession of a firearm in furtherance of a drug trafficking crime (Count 2 in 2:20-cr-151-ACA-JHE).

As relevant to this appeal, Williamson was sentenced for a term of life as to Counts 1, 2, and 5; 60 months as to Count 3; 480 months as to Count 6; 240 months as to Count 8; and 48 months as to each of Counts 34, 35, 39, 40, and 41, separately, with each count to be served concurrently with the other; all followed by 60 months as to Count 7, consecutively. At sentencing, counsel expressly noted that "Count 2 is a lesser included offense of Count 1 and groups in. But I understand that it's—life is the guideline."

Gregory was sentenced to 480 months as to Count 2 and 360 months as to Count 13, separately, with each count to be served concurrently with the other. Before sentencing, a presentence report was prepared that recommended a base offense level of 38 due to the amount of drugs attributable to Gregory, including 20 kilograms of heroin and 100 kilograms of meth. Gregory objected, arguing that he should only be held responsible for the 14.22 grams of cocaine hydrochloride that the jury attributed to him. The district court credited the testimony of the government's trial witnesses as to the drug quantity attributable to Gregory and ultimately overruled his objection "based on the evidence as a whole."

This appeal followed.

## II.

The defendants raise six issues on appeal. First, Williamson argues that two search warrants—one for a home and one for an apartment—lacked probable cause because the home warrant was supported by unconstitutional pole camera footage and both warrants were supported by stale information. He further contends that the apartment warrant was an unlawful general warrant. Second, each defendant challenges the sufficiency of the evidence supporting his respective conspiracy conviction. Third, Williamson challenges the sufficiency of the evidence supporting his convictions for possession of a firearm in relation to a drug trafficking crime, possession of a firearm in furtherance of a drug trafficking crime, engaging in a continuing criminal enterprise, and the use of a communication facility to commit a drug trafficking crime.

Fourth, Archie argues that the district court erred when it allowed improper opinion testimony from Agent Gerhardt as to the meaning of the phrase "a cup of ice." Fifth, Williamson argues that, as to his continuing criminal enterprise conviction, the district court erred by not instructing the jury that it must agree about which five individuals Williamson organized or that "a mere buyer-seller relationship" does not satisfy the conviction's requirements. Lastly, Gregory challenges the substantive reasonableness of his sentence. We address each issue in turn.

*A.*

We start with Williamson's challenges to the warrants authorizing searches of the home and apartment. First, as to the home warrant, Williamson argues that the pole camera footage used to generate probable cause constituted a warrantless search in violation of the Fourth Amendment. He further contends that the home warrant's supporting affidavits relied on stale information. Second, as to the apartment warrant, Williamson argues that its supporting affidavits relied on stale information and that the warrant itself constituted an unlawful general warrant.

1.

We begin with the home warrant. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." A search occurs in two ways: when the government "obtains information by physically intruding on a constitutionally

16                    Opinion of the Court                    22-12800

protected area," *United States v. Jones*, 565 U.S. 400, 407 n.3 (2012), and "when an expectation of privacy that society is prepared to consider reasonable is infringed," *United States v. Karo*, 468 U.S. 705, 712 (1984) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). Here, Williamson does not contend that a trespass occurred. Instead, he asserts that the pole cameras invaded his reasonable expectation of privacy because they were focused on his home and recorded non-stop. We disagree.

First, we cannot say Williamson had a reasonable expectation of privacy in the areas surveilled—the front area and backyard of his home—because they were both exposed to the public. *See Katz v. United States*, 389 U.S. 347, 351 (1967). "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Id.* The front area, by all accounts, was entirely visible to the public. And the back area, Williamson himself concedes, is not fully enclosed. The magistrate judge expressly found that "an observer standing [on a public road] could see into the Arlington Avenue House's back yard, with her view obstructed only by some overgrown vegetation." And Williamson does not challenge that factual finding as clearly erroneous.

Williamson nonetheless argues that the Colorado Supreme Court's decision in *People v. Tafoya*, 494 P.3d 613 (Colo. 2021), supports his position. But we disagree. In *Tafoya*, police mounted a pole camera across the street from Rafael Tafoya's house without first securing a warrant. *Id.* at 614. The pole camera continuously

recorded footage of Tafoya's property—including his backyard, which was otherwise hidden by a six-foot-high privacy fence—for over three months. *Id.* The court held that "police use of the pole camera to continuously video surveil Tafoya's fenced-in curtilage for three months, with the footage stored indefinitely for later review, constituted a warrantless search in violation of the Fourth Amendment." *Id.* at 618. But when doing so, it recognized that "a person standing on the street *could not see into the backyard*"—giving rise to a subjective expectation of privacy. *Id.* at 622 (emphasis added). Williamson's surveilled areas, on the contrary, were visible by and exposed to the public—providing him no such expectation of privacy. *See United States v. Dennis*, 41 F.4th 732, 740–41 (5th Cir. 2022) (explaining that the use of a pole camera was not a search because "one can see through [the defendant's] fence and [thus] the cameras captured what was open to public view from the street"). Because Williamson's backyard was open to public view from an observer standing on the street, we need not—and do not—address whether the use of a pole camera to record over a privacy fence into an otherwise enclosed backyard invades a reasonable expectation of privacy.

Second, the pole cameras' capacity to record non-stop does not transform the Fourth Amendment analysis in the manner Williamson suggests. Nothing in the Constitution forbids the government from using technology to conduct lawful investigations more efficiently. The authorities Williamson cites for support—Justice Alito's and Justice Sotomayor's concurrences in *United States v. Jones*, 565 U.S. 400 (2012) and the Supreme Court's decision in

*Carpenter v. United States*, 585 U.S. 296 (2018)—are wholly consistent with that principle.

The Supreme Court in *Jones* held that the government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constituted a search. 565 U.S. at 404. In reaching that conclusion, the Court relied on a trespass-based rule. *See id.* at 409 ("[T]he *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test."). Justice Alito agreed with the Court's judgment but wrote separately to clarify that he would have eschewed the trespass approach and simply asked "whether respondent's reasonable expectations of privacy were violated by the long-term monitoring of the movements of the vehicle he drove." *Id.* at 419 (Alito, J., concurring). Williamson seizes on this language because it identifies a durational element to the Fourth Amendment analysis of surveillance—but he ignores that pole cameras and GPS trackers are meaningfully different forms of surveillance. For Justice Alito, the GPS monitoring in *Jones* was a search because "law enforcement agents tracked every movement that respondent made in the vehicle he was driving." *Id.* at 430. By contrast, a pole camera does not track movement. It does not track location. It is stationary—and therefore does not "follow" a person like a GPS attached to his vehicle. As such, it is difficult to see why Justice Alito's concurrence about GPS devices would extend to an inapposite technology like pole cameras.

Similarly, Justice Sotomayor focused on the "unique attributes" of GPS surveillance. *Id.* at 415 (Sotomayor, J., concurring). "GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations." *Id.* A pole camera pointed at a house provides virtually none of this information—and to the extent that it does, it does so at a level of detail markedly lower than a GPS tracking device.

The Supreme Court's decision in *Carpenter* likewise does not support Williamson's position. There, the Court held that the government conducts a search under the Fourth Amendment when it accesses cell phone records that provide a comprehensive chronicle of the user's past movements. 585 U.S. at 300. Gesturing toward *Jones*, the Court recognized that cell phone tracking "partakes of many of the qualities of the GPS monitoring we considered in *Jones*." *Id.* at 309. "Much like GPS tracking of a vehicle, cell phone location information is detailed, encyclopedic, and effortlessly compiled." *Id.* And as with GPS information, "the time-stamped data provides an intimate window" into a person's life. *Id.* at 311.

According to Williamson, *Carpenter* demonstrates that modern technology does not provide law enforcement carte blanche to ignore the Fourth Amendment. True enough. But as with *Jones*, the *Carpenter* decision concerned a technology that is meaningfully different than pole cameras. Pole cameras are distinct both in terms of the information they mine and the degree of intrusion necessary to do so. Moreover, the *Carpenter* majority clarified that its decision

is "narrow" and, of particular relevance here, does not "call into question conventional surveillance techniques and tools, such as security cameras." *Id.* at 316. Pole cameras are a conventional surveillance technique very similar to security cameras—and the government has used them for surveillance across the country for decades. *See, e.g., United States v. Bregu*, 948 F.3d 408, 411 (1st Cir. 2020) (noting the use of a pole camera outside a suspect's residence to gather evidence); *United States v. Christie*, 825 F.3d 1048, 1067 (9th Cir. 2016) ("Before applying for the wiretaps, the government also installed a pole camera outside the Ministry's front entrance"); *United States v. Gaskins*, 690 F.3d 569, 574 (D.C. Cir. 2012) (noting the use of a pole camera in a narcotics conspiracy investigation); *United States v. Price*, 418 F.3d 771, 781–82 (7th Cir. 2005) (noting the use of a pole camera in a conspiracy investigation); *United States v. Carraway*, 108 F.3d 745, 749 (7th Cir. 1997) (noting the use of a pole camera in an investigation). Thus, to the extent that *Carpenter* is relevant to Williamson's case, it cuts against him.

Our reasoning accords with the Sixth and Seventh Circuits—both of which have addressed surveillance in general and pole cameras in particular. In *United States v. Houston*, 813 F.3d 282 (6th Cir. 2016), the Sixth Circuit evaluated the legality of footage "recorded over the course of ten weeks by a camera installed on top of a public utility pole approximately 200 yards away" from the farm being observed. *Id.* at 285. It held that, "[a]lthough this ten-week surveillance was conducted without a warrant, the use of the pole camera did not violate Houston's reasonable expectations of privacy because the camera recorded the same view . . . as that enjoyed by

passersby on public roads." *Id.* As in Williamson's case, the officers "only observed what Houston made public to any person traveling" on the surrounding roads. *Id.* at 288.

Moreover, the court squarely addressed Williamson's contention concerning the duration of surveillance: "the length of the surveillance did not render the use of the pole camera unconstitutional, because the Fourth Amendment does not punish law enforcement for using technology to more efficiently conduct their investigations." *Id.* In other words, "[w]hile the . . . agents could have stationed agents round-the-clock to observe Houston's farm in person, the fact that they instead used a camera to conduct the surveillance does not make the surveillance unconstitutional." *Id.* The Sixth Circuit has since reaffirmed its reasoning. *See United States v. Powell*, 847 F.3d 760, 773 (6th Cir. 2017) (holding that the warrantless surveillance of three buildings through the installation of video cameras on three public utility poles, for periods of up to 90 days each, did not violate the defendants' Fourth Amendment rights); *United States v. May-Shaw*, 955 F.3d 563, 567 (6th Cir. 2020) (holding that warrantless, long-term pole camera surveillance of the defendant's partially-enclosed carport was not a violation of the Fourth Amendment—even if the carport constituted the curtilage of his apartment).

Similarly, in *United States v. Tuggle*, the Seventh Circuit considered the government's warrantless use of three video cameras affixed to utility poles to monitor Tuggle's nearby residence. 4 F.4th 505, 511 (7th Cir. 2021). The cameras recorded his property

for nearly eighteen months and offered several advantages to the government's investigation. *Id.* While in use, the cameras recorded around the clock. *Id.* Rudimentary lighting technology improved the quality of overnight footage. *Id.* And agents could remotely zoom, pan, and tilt the cameras and review footage in real time. *Id.* Relying on *Carpenter*, Tuggle argued that the pole cameras unconstitutionally "captured the whole of [his] movements." *Id.* at 524 (citation and internal marks omitted).

The Seventh Circuit rejected his argument: "the stationary cameras placed around Tuggle's house captured an important sliver of Tuggle's life, but they did not paint the type of exhaustive picture of his every movement that the Supreme Court has frowned upon." *Id.* "If the facts and concurrences of *Jones* and *Carpenter* set the benchmarks, then the surveillance in this case pales in comparison." *Id.* It recognized, with *Carpenter* in mind, that whether pole cameras are the same as security cameras is irrelevant "because the cameras here would clearly qualify as a conventional surveillance technique[]." *Id.* at 526 (citation and internal marks omitted). Accordingly, the Seventh Circuit concluded that the use of pole cameras—even the prolonged use—does not constitute a search under the Fourth Amendment as a matter of law. And in doing so, it noted a compelling legal reality: "no federal circuit court has found a Fourth Amendment search based on long-term use of pole cameras on public property to view plainly visible areas of a person's home." *Id.* at 522. We decline to alter that status quo.

Williamson cites one court that has held otherwise, but we are not persuaded. In *State v. Jones*, 903 N.W.2d 101 (S.D. 2017), the Supreme Court of South Dakota addressed law enforcement's warrantless installation of a pole camera on a public streetlight to record Jones's activities. *Id.* at 103. Officers used the camera's two months of footage to obtain a search warrant for his home. *Id.* Pointing to the "amassed nature" of the surveillance, the court held that officers violated Jones's reasonable expectation of privacy. *Id.* at 111–13. We cannot agree with that reasoning. *State v. Jones* was decided before *Carpenter* and therefore did not have the benefit of *Carpenter*'s clarification that "conventional surveillance techniques and tools, such as security cameras," are not searches just because they record large amounts of data. *Carpenter*, 585 U.S. at 316.

Having addressed the pole camera issue, we also believe that Williamson's other challenge to the home warrant—that its supporting affidavits relied on stale information—fails as well. According to Williamson, law enforcement relied on the June 11th controlled buy to support the search warrant for his home. But that controlled buy, he recounts, only turned up a personal-use amount of marijuana—and thereby failed to establish probable cause for a massive drug operation. Williamson cites *United States v. Underwood*, which held that a detective's observation of a personal-use amount of marijuana at the defendant's home failed to support the conclusion that he was a courier for an ecstasy trafficking organization or that evidence of such trafficking would be found at his home. 725 F.3d 1076, 1082–83 (9th Cir. 2013).

Williamson's arguments on this score are unpersuasive for at least two reasons.

First, Williamson overlooks the significance of the "personal-use amount of marijuana" in *Underwood*. Here, Williamson sold heroin, not marijuana. And he did not merely have a personal-use amount in his home—he *sold* a personal-use amount. We have recognized that drug trafficking activities are "inherently protracted and continuous." *United States v. Magluta*, 198 F.3d 1265 (11th Cir. 1999) (citation and internal marks omitted), *opinion vacated in part on other grounds on reh'g*, 203 F.3d 1304 (11th Cir. 2000). Because Williamson was selling personal-use amounts out of his home, there was good reason to believe that some stash of drugs would be present at Williamson's home. Unlike *Underwood*, where a detective merely observed a zip-lock bag containing a personal-use amount of marijuana, law enforcement here reasonably understood Williamson—having surveilled him—to be selling drugs systematically from a larger stash.

Second, even if the controlled buy produced only stale information, the district court reasonably found that subsequent transactions updated the evidence obtained through that buy, indicating that drugs were still likely to be at the house. For example, the affidavit provides evidence that Williamson was engaged in drug-related transactions with at least four others during the period *between* the controlled purchase and the application for the warrant. So, in sum, the controlled buy was more telling than Williamson

admits, and even if the evidence from it was thrown out altogether, subsequent transactions would have supported probable cause.

2.

We turn now to the apartment warrant. The exclusionary rule "generally prohibits the government from relying on evidence obtained in violation of the Fourth Amendment." *United States v. McCall*, 84 F.4th 1317, 1323 (11th Cir. 2023), *cert. denied*, 144 S. Ct. 1042 (2024). Consistent with the rule's objective of future deterrence, a "good faith exception" applies even to close calls and threshold cases. *Id.* at 1323–25 (citing *Messerschmidt v. Millender*, 565 U.S. 535, 556 (2012)). To establish that the good faith exception to the exclusionary rule does not apply to the apartment warrant, Williamson must prove that the warrant is "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Id.* at 1323 (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)). In making that determination, "[w]e look only to the face" of the affidavit. *Id.* at 1325 (citing *United States v. Robinson*, 336 F.3d 1293, 1296 (11th Cir. 2003)). The affidavit must be so clearly insufficient "that it provided 'no hint' as to why police believed they would find incriminating evidence." *United States v. Morales*, 987 F.3d 966, 976 (11th Cir. 2021).

There is simply no plausible argument that the information or affidavit supporting the apartment warrant is excludable. "There was no reason to think that the judge's approval of the warrant was unusual or suspect." *McCall*, 84 F.4th at 1329. No one has alleged that any affiant provided information that he knew was false. Nor

was any of the information provided unclear or insufficiently particular. And even taking the warrant's alleged deficiencies as true, none of them would require suppression under the foregoing standards. *See id.* at 1328 (applying the good faith exception to an overbroad warrant because, despite its overbroadness, it was not so "facially deficient" that officers could not have reasonably relied on it when executing their search).

Moreover, there are several reasons why a reasonable officer could have relied on the warrant. First, the warrant sought non-perishable items typically held for long periods of time. For example, the supporting affidavit contained evidence that Williamson stored money and personalized, expensive jewelry in the apartment—specifically, Williamson's $30,000 gold necklace and "RAW" pendant. A reasonable officer could have expected that Williamson would still possess the necklace two years later. Second, as Agent Gerhardt detailed in the affidavit, Williamson did not appear to have any legitimate source of income. Nevertheless, large and unexplained sums of money moved through affiliated bank accounts—and Williamson made tens of thousands of dollars' worth of jewelry purchases in cash. Lastly, the objective reasonableness of the officers' reliance on the warrant is bolstered by the extensive background information provided by the confidential source—information about Williamson's involvement with drug trafficking, corroborated and refreshed by the confidential source's controlled purchase of heroin. For the foregoing reasons, we hold that the good faith exception applies to the apartment warrant.

*B.*

We now address the defendants' various sufficiency challenges. Each defendant challenges the sufficiency of the evidence supporting his conspiracy conviction. Williamson further challenges the sufficiency of the evidence supporting his convictions for possession of a firearm in relation to a drug trafficking crime, possession of a firearm in furtherance of a drug trafficking crime, engaging in a continuing criminal enterprise, and the use of a communication facility to commit a drug trafficking crime.

We review the sufficiency of the evidence to support a conviction *de novo*, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict. *United States v. Rodriguez*, 218 F.3d 1243, 1244 (11th Cir. 2000).

1.

We begin with each defendant's challenge to the sufficiency of the evidence supporting his conspiracy conviction. To sustain a conviction under 21 U.S.C. Section 846, the government must have proven beyond a reasonable doubt that (1) an illegal agreement existed to possess with the intent to distribute a controlled substance; (2) each defendant knew of the agreement; and (3) each defendant knowingly and voluntarily joined the agreement. *United States v. Charles*, 313 F.3d 1278, 1284 (11th Cir. 2002). It did not have to prove that each defendant knew every detail or participated in

every stage of the conspiracy—only that they knew its essential nature. *United States v. Morel*, 63 F.4th 913, 919 (11th Cir. 2023).

a.

Williamson argues that the evidence supported only a buyer-seller relationship between him and others. We are unpersuaded.

The government presented evidence establishing that Williamson received kilos of cocaine that he stored at his home, that he would obtain a kilo or two of heroin each month for resale, and that he had suitcases full of marijuana stored at his apartment. Three individuals—Errick Daniel, Derrick Bland, and Leanthony Gillins—stayed at Williamson's house and sold drugs he supplied. Isiah Thomas testified that he dealt drugs with Williamson for several years. Virtually all of this evidence was consistent with—and corroborated by—other testimony, video evidence, and intercepted phone calls. Based on the quantity of drugs and the frequency with which they were sold, as well as the context surrounding Williamson's routine interactions with others, there is simply no plausible argument that the government failed to carry its burden on Williamson's conspiracy charge. *See United States v. Gomez*, 164 F.3d 1354, 1356 (11th Cir. 1999) (recognizing that evidence of a conspiracy, as opposed to a buyer-seller relationship, may include transactions involving large quantities of drugs and prolonged cooperation between the parties); *United States v. Gallardo*, 977 F.3d 1126, 1140 (11th Cir. 2020) (explaining that circumstantial evidence

of an understanding between persons to engage in illicit conduct may serve as proof of the existence of an agreement).

b.

Taylor, like Williamson, argues that the government's evidence merely suggests a buyer-seller relationship between himself and others. And he contends that the government offered no testimony that he ever talked to Williamson or dealt with Williamson. We reject both arguments.

First, as to Taylor's buyer-seller argument, Kenneth Johnson testified that he and Taylor began dealing drugs as early as 2012, "split up for some years," and resumed in 2018. Taylor would supply Johnson with meth and heroin that Johnson would then sell to others. Johnson testified that he once saw Taylor with "like a pound" of meth. Isiah Thomas testified that he sold Taylor heroin. And both Johnson and Thomas's testimonies were corroborated by either phone calls or text messages. Recognizing that "repeated transactions buying and selling large quantities of illegal drugs" is "sufficient evidence that the participants were involved in a conspiracy to distribute those drugs in the market," we reject Taylor's arguments for much the same reasons we rejected Williamson's arguments. *United States v. Brown*, 587 F.3d 1082, 1089 (11th Cir. 2009).

Second, as to whether Taylor ever talked directly to Williamson, "[i]t is irrelevant that particular conspirators may not have known other conspirators or may not have participated in every stage of the conspiracy; all that the government must prove is an

agreement or common purpose to violate the law and intentional joining in this goal by coconspirators." *United States v. Richardson*, 532 F.3d 1279, 1284 (11th Cir. 2008) (citation and internal marks omitted). The government proved "an agreement or common purpose" through the evidence presented above.

c.

Gregory argues there was no credible evidence proving he was aware of any conspiracy, entered into any agreement to commit a crime, or knowingly and voluntarily joined any conspiracy. We disagree.

As we have explained, a conspiracy can be found if the evidence allows an inference that the buyer and seller knew the drugs were for distribution. *United States v. Achey*, 943 F.3d 909, 917 (11th Cir. 2019). Here, the evidence established that Gregory dealt drugs with Isaac Robinson who, in turn, was a source for Williamson, selling him both meth and marijuana. It also established that Gregory sold kilos of meth to Demarcus Whitt routinely over several months. Later, Whitt began to supply drugs to Gregory—a relationship that, at one point, resulted in the two meeting so that Gregory could pay Whitt about $30,000 for meth. The amount of drugs exchanged, the regularity of those exchanges, and the corresponding prices all clearly evince knowledge of distribution. *See Gomez*, 164 F.3d at 1356; *Brown*, 587 F.3d at 1089. The government carried its burden as to Gregory's conspiracy charge.

d.

Lastly, Archie argues there is no credible evidence he knew of any conspiracy, entered into any agreement to commit a crime, or knowingly and voluntarily joined any conspiracy. Pointing out that the government presented testimony from "a convicted felon and co-conspirator" who was offered "leniency in sentencing," Archie's core contention seems to be that Isiah Thomas's testimony was unreliable and untrustworthy.

However, "[c]redibility questions are the exclusive province of the jury, and on sufficiency review we must assume that they were answered in a manner that supports the verdict . . . unless witness testimony is 'unbelievable' as a matter of law." *United States v. Downs*, 61 F.4th 1306, 1316 (11th Cir.), *cert. denied*, 144 S. Ct. 181 (2023) (internal citations omitted). Thomas, to whom Williamson was a primary source, testified that Williamson supplied Archie with re-sale quantities of marijuana—"about three pounds" "once or twice a week." Thomas observed these transactions and testified that they occurred over the course of about two years. Particularly given that Archie was in possession of 74.6 grams of marijuana, a handgun, and a digital scale when arrested, Thomas's testimony is not "unbelievable." Viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict, we reject Archie's argument.

2.

We now address Williamson's remaining sufficiency challenges to four of his other convictions.

The first of these convictions, using or carrying a firearm during and "in relation to" a drug trafficking crime (Count 1 in 2:20-cr-405-ACA-JHE), arises from the fact that Williamson was in possession of two firearms—one in his car and one on his person, along with marijuana and cash—when he was arrested. To sustain this conviction, the government must have proven that Williamson "(1) knowingly (2) possessed a firearm (3) during and in relation to a drug trafficking crime or a crime of violence." *United States v. Isnadin*, 742 F.3d 1278, 1307 (11th Cir. 2014). Williamson seemingly concedes that, at the time he was arrested, he was knowingly in possession of firearms. He argues, however, that the government presented no evidence linking those firearms to the furtherance of a drug trafficking offense at the time of his possession.

But Williamson mischaracterizes the government's burden. This conviction relies on the "in relation to" language of Section 924(c)—not the "in furtherance of" language. For the former, a firearm must merely facilitate, or have the potential of facilitating, the drug trafficking offense. *Smith v. United States*, 508 U.S. 223, 238 (1993). In determining whether a firearm has that potential, we consider the "proximity of the firearm to the drugs or drug profits" and "the time and circumstances under which the firearm is found." *United States v. Mercer*, 541 F.3d 1070, 1077 (11th Cir. 2008). Given that Williamson was in possession of the two firearms *and* marijuana, $14,000 in cash, and additional magazines when he was arrested, it was reasonable for the jury to conclude that Williamson possessed the firearms "in relation to" his drug crimes.

The second of these convictions—possession of a firearm "in furtherance of" a drug trafficking crime (Count 7)—arises from the fact that firearms were recovered from Williamson's apartment along with drugs and cash. To sustain this conviction, the government must have proven "that the firearm helped, furthered, promoted, or advanced the drug trafficking." *United States v. Timmons*, 283 F.3d 1246, 1252 (11th Cir. 2002). Williamson contends that the government presented no evidence that the firearms recovered from his apartment were connected to any drug operation or that he actively or constructively possessed them.

Williamson's objections are foreclosed by our precedents. In *Mercer*, we held that, because a firearm "was readily available in the same room where a jury could infer drugs were being packaged for sale and available in the immediate vicinity of items commonly used in a drug operation," the evidence "was sufficient for a reasonable jury to find that Defendant possessed the firearm 'in furtherance of' a drug trafficking crime." 541 F.3d at 1077; *see also United States v. Suarez*, 313 F.3d 1287, 1293 (11th Cir. 2002) (explaining that a defendant's possession of firearms was "in furtherance of" a drug trafficking conspiracy where they were accessible across his home, which was the main initial storage point for drugs brought into the country). Here, the firearms at issue were found in Williamson's apartment—along with a substantial amount of marijuana, 135 grams of fentanyl and heroin mixed, $95,000 in cash, several other firearms, and 1,400 rounds of ammunition. We conclude that the government carried its burden as to this conviction.

The third of these convictions—engaging in a continuing criminal enterprise (Count 1)—arises out of Williamson's extensive involvement in drug trafficking. To sustain this conviction, the government must have proven: (1) a felony violation of the federal narcotics laws (2) as part of a continuing series of violations (3) in concert with five or more persons (4) for whom Williamson was an organizer or supervisor (5) from which he derives substantial income or resources. *United States v. Witek*, 61 F.3d 819, 821–22 (11th Cir. 1995). "[A]n organizer does not necessarily control those people he organizes, but simply arranges their activities into an orderly operation." *Id.* at 823. Williamson argues that we cannot (1) say *which* five people the jury relied upon in concluding "that [he] managed, directed, or organized them," or (2) rely "on the uncorroborated testimony" of Isiah Thomas in assessing the evidence. We disagree.

First, as to Williamson's argument about which five people he managed, directed, or organized, we have never held that a jury must unanimously agree as to the identities of the co-conspirators. *See United States v. Raffone*, 693 F.2d 1343, 1348 (11th Cir. 1982) (recognizing that the "independent efforts of this court" have "revealed no such authority" that "the jury must unanimously agree as to the identities of the co-conspirator(s)" in 21 U.S.C. Section 848 charges). On the contrary, we have recognized that, "[w]hile the jury must reach a consensus on the fact that there were five or more underlings, which is an essential element of the CCE [Continuing Criminal Enterprise] offense, there is no logical reason why there must be unanimity on the identities of these underlings."

*United States v. Moorman*, 944 F.2d 801, 803 (11th Cir. 1991) (quoting *United States v. Jackson*, 879 F.2d 85, 88 (3rd Cir. 1989)); *see also Richardson v. United States*, 526 U.S. 813, 824 (1999) (assuming, without deciding, the government's argument that a jury need not unanimously agree about the five or more persons' identities). We do not hold differently today. The government carried its burden as to this conviction.

Second, as to the credibility of Thomas's testimony, we have explained that such credibility determinations are "the 'exclusive province' of the jury 'and the court of appeals may not revisit this question unless it is incredible as a matter of law.'" *United States v. Hano*, 922 F.3d 1272, 1289 (11th Cir. 2019) (quoting *United States v. Feliciano*, 761 F.3d 1202, 1206 (11th Cir. 2014)). The government does not concede that Thomas's testimony was uncorroborated, but even assuming it was, "uncorroborated testimony of an accomplice may support a conviction if it is not incredible or otherwise unsubstantial on its face." *Tillery v. United States*, 411 F.2d 644, 647 (5th Cir. 1969). Given the formidable evidence against Williamson, nothing in Thomas's testimony is "incredible." We reject Williamson's argument.

The last of these convictions—use of a communication facility to facilitate a drug trafficking crime (Counts 34, 35, 39, 40, and 41)—arises from Williamson's use of a telephone to facilitate drug trafficking. To sustain it, the government must have proven that he knowingly and intentionally used a communication facility—here, a telephone—to facilitate the commission of a drug

trafficking crime. *United States v. Mertilus*, 111 F.3d 870, 872 (11th Cir. 1997). To prove facilitation, it must have established that the telephone call comes within the common meaning of facilitate—to make easier or less difficult, or to assist or aid. *United States v. Orihuela*, 320 F.3d 1302, 1305 n.9 (11th Cir. 2003). Williamson, convicted of five separate violations, challenges all five as improper because "[t]he recordings—and the transcriptions—do not speak for themselves." He contends that, because the statements were "vague," the government's evidentiary showing was insufficient. We are unpersuaded.

As discussed above, the government provided recordings of each telephone conversation. Four of the conversations directly pertain to drugs: Williamson checks in with Darrius Johnson as to the quantity of drugs Johnson currently has; confirms with Leanthony Gillins that Williamson is "still gonna bring it"; sets up a drug deal with Isiah Thomas; and discusses the quality of two different strains of marijuana with Tevion Poole. The remaining conversation involves Williamson and Johnson discussing the fact that Johnson had been stopped by police and his truck had been searched soon after leaving Williamson's house. Given the nature of Williamson's drug trafficking offenses and the fact that those he spoke to were also involved, a reasonable jury could have concluded that each call facilitated either a particular narcotics offense or the overall conspiracy—thereby satisfying the government's burden.

Even though we conclude that there was sufficient evidence to convict Williamson for each count, we must vacate Williamson's conspiracy charge (Count 2) because it is a lesser-included offense of the CCE charge (Count 1). *See Rutledge v. United States*, 517 U.S. 292, 307 (1996) ("A guilty verdict on a § 848 charge necessarily includes a finding that the defendant also participated in a conspiracy violative of § 846; conspiracy is therefore a lesser included offense of CCE."). The government concedes as much. Having now found that the evidence was sufficient to sustain both, we vacate Williamson's conspiracy conviction. Resentencing on the basis of this vacatur is nevertheless inappropriate because the district court sentenced Williamson to life independently and individually "as to Counts 1, 2, and 5," Count 2 did not otherwise impact or aggravate the other counts for the purposes of sentencing, and the district court was made aware—at sentencing—that Count 2 is a lesser-included offense of Count 1 and "groups in." Accordingly, we vacate Williamson's conspiracy conviction as duplicative of his CCE conviction, but we decline to remand for resentencing.

## C.

We now address three arguments about alleged issues at trial—one from Archie and two from Williamson. Archie argues that the district court erred when it allowed testimony consisting of an improper opinion from Agent Gerhardt. Williamson argues that, as to his continuing criminal enterprise charge, the district court erred by not instructing the jury that it must agree about which five individuals Williamson organized and that "a mere

buyer-seller relationship" does not satisfy the charge's requirements.

1.

We begin with Archie. Agent Gerhardt testified two times: once as an expert and once as a fact witness. Archie objects to a portion of Gerhardt's testimony as a fact witness that concerned Gerhardt's interpretation of the phrase "a cup of ice." Specifically, Gerhardt testified that when Archie used the phrase "a cup of ice" on a recorded phone call, he was referring to "one ounce or one-half ounce quantities of methamphetamine." Archie argues that an agent testifying as a fact witness "may not tell the jury what they should believe about ordinary language captured by virtue of a telephone interception." And he contends that "the agent went beyond" what was being said and "testified to his interpretation of the entirety of the conversation in the phone call." We reject Archie's argument.

Even if Gerhardt's analysis was better suited for his testimony as an expert, "[a]n evidentiary error is harmless unless there is a reasonable likelihood that [it] affected the defendant's substantial rights." *United States v. Frediani*, 790 F.3d 1196, 1202 (11th Cir. 2015) (citation and internal marks omitted). There is no possibility that this alleged error affected Archie's substantial rights because the jury only attributed the distribution of marijuana—not meth— to him for purposes of the conspiracy conviction. As such, Gerhardt's testimony concerning meth could not have had "a substantial influence on the outcome" and therefore does not warrant

reversal. *See United States v. Hands*, 184 F.3d 1322, 1329 (11th Cir.), *corrected*, 194 F.3d 1186 (11th Cir. 1999) ("We need not reverse [the] conviction if the error had no substantial influence on the outcome and sufficient evidence uninfected by error supports the verdict.") (citation and internal marks omitted).

2.

We turn now to Williamson's two instructional arguments. "We review a district court's jury instructions for an abuse of discretion." *United States v. Williams*, 541 F.3d 1087, 1089 (11th Cir. 2008). "Error in jury instructions does not constitute grounds for reversal unless there is a reasonable likelihood that it affected the defendant's substantial rights." *United States v. Wright*, 392 F.3d 1269, 1277 (11th Cir. 2004). "Defendants are not entitled to the jury instructions using the precise language they request where the district court's 'charge adequately addresses the substance of the defendant's request.'" *United States v. Horner*, 853 F.3d 1201, 1210 (11th Cir. 2017) (quoting *United States v. Silverman*, 745 F.2d 1386, 1396 (11th Cir. 1984)).

Williamson's unanimity argument—that the district court should have instructed the jury that it must agree about which five individuals Williamson organized—is foreclosed by our precedents. *See, e.g., United States v. Curry*, 902 F.2d 912, 915 (11th Cir. 1990) (recognizing that there is no plain error when a district court does not instruct the jury as to unanimity regarding the supervision requirement in a CCE case); *United States v. Raffone*, 693 F.2d 1343, 1348 (11th Cir. 1982) (same); *United States v. Moorman*, 944 F.2d 801,

803 (11th Cir. 1991) ("While the jury must reach a consensus on the fact that there were five or more underlings, which is an essential element of the CCE offense, there is no logical reason why there must be unanimity on the identities of these underlings.") (citation omitted). Williamson offers no persuasive argument as to why we should change course now.

Williamson's remaining argument—that the jury should have been instructed that a "mere buyer-seller relationship will not satisfy" the requirements of the continuing criminal enterprise charge—falls short as well. The district court's decision not to give the requested jury instruction did not "seriously impair[] the defendant's ability to present an effective defense." *United States v. Ndiaye*, 434 F.3d 1270, 1293 (11th Cir. 2006). In defining the charge at trial, the district court explained that the government must prove a "continuing series of violations with at least five other people" and that Williamson "was an organizer, supervisor, or manager and either organized or directed the activities of the others." Being "an organizer, supervisor, or manager" excludes—by its plain text—a mere buyer-seller relationship. When one merely buys or sells something to someone, he is not organizing, supervising, or managing that person. Moreover, his proposed jury instruction—which neither defined buyer-seller relationships and managerial ones nor clarified distinctions between them—would not have fixed the alleged problem. The district court did not abuse its discretion in concluding that the pattern jury instruction encompassed this issue.

### D.

Lastly, we address Gregory's sentencing. Although Gregory argues about the reasonableness of his sentence, our review of the record conclusively demonstrates that Gregory was sentenced above the statutory maximum authorized by the jury's verdict. A district court commits plain error by sentencing above the statutory maximum. *See United States v. Sanchez*, 586 F.3d 918, 930 (11th Cir. 2009). The quantity of drugs found by the jury subjected Gregory to the penalty provisions of 21 U.S.C. § 841(b)(1)(C). Even with his prior conviction enhancement under 21 U.S.C. § 851, the government concedes that the applicable statutory maximum sentence was 30 years. Accordingly, we vacate Gregory's sentence in its entirety and remand for resentencing. *See United States v. Eldick*, 393 F.3d 1354, 1354 (11th Cir. 2004) (explaining that, generally speaking, "[a] criminal sentence is a package of sanctions"); *United States v. Tamayo*, 80 F.3d 1514, 1520 n.7 (11th Cir. 1996) ("[O]ur court has been explicit when it is vacating an entire original sentencing package as opposed to remand for resentencing on a single issue."). Gregory's alternative arguments about the reasonableness of his sentence are moot.

### III.

We **AFFIRM** each conviction, except Williamson's conspiracy conviction, which we **VACATE**, and we **AFFIRM** each sentence, except Gregory's, which we **VACATE** in its entirety and **REMAND** for resentencing, consistent with this opinion.

22-12800                    JORDAN, J., Concurring                    1

JORDAN, Circuit Judge, Concurring in Part and Concurring in the Judgment:

I join the majority's opinion as to all but the Introduction and Part II.A.1. As to Part II.A.1, I concur in the judgment. I would leave the constitutionality of the pole camera for another day and would instead reject Mr. Williamson's Fourth Amendment challenge to the search warrant based on the good-faith exception to the exclusionary rule.

A "warrantless search . . . is reasonable only if it falls within a recognized exception." *Missouri v. Neely*, 569 U.S. 141, 148 (2013). *See also Fuqua v. Turner*, 996 F.3d 1140, 1151 (11th Cir. 2021) (explaining that, as a general matter, "[w]arrantless searches are *per se* unreasonable") (internal quotation marks omitted) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). But even when government officials violate the Fourth Amendment, evidence will not be suppressed if the good-faith exception to the exclusionary rule applies. *See Davis v. United States*, 564 U.S. 229, 238 (2011) (noting that "when the police act with an objectively reasonable good-faith belief that their conduct is lawful . . . the deterrence rationale [of the exclusionary rule] loses much of its force and exclusion cannot pay its way") (citation and internal marks omitted); *United States v. Morales*, 987 F.3d 966, 973 (11th Cir. 2021) ("[U]nder the good faith exception to the exclusionary rule, courts decline to suppress evidence when suppression would not further the rule's deterrent purpose.").

The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would

2                    JORDAN, J., Concurring                    22-12800

have known that the search was illegal in light of all the circum-stances." *Herring v. United States*, 555 U.S. 135, 145 (2009) (citation and internal quotation marks omitted). We have applied the good-faith exception to "close calls and threshold cases." *United States v. McCall*, 84 F.4th 1317, 1325 (11th Cir. 2023). *See, e.g., United States v. Mapson*, 96 F.4th 1323, 1334–35 (11th Cir. 2024) (applying the good-faith exception to the warrantless access of automated license plate reader databases because at the time of the conduct binding circuit precedent—later abrogated by *United States v. Carpenter*, 585 U.S. 296 (2018)—authorized an officer to obtain a person's cell-site loca-tion data without a warrant).

Applying the good-faith exception here, an officer in this cir-cuit could hold an objectively reasonable belief that the warrantless installation of pole cameras in a public space and directed at a pub-lic-facing property for any period of time would not violate the Fourth Amendment. First, our cases have not addressed the con-stitutionality of pole cameras. Second, the state and federal courts that have addressed this issue are divided. The Sixth, Seventh, and Tenth Circuits have found no Fourth Amendment violation when pole cameras are used without a warrant. *See, e.g., United States v. House*, 120 F.4th 1313, 1316–18 (7th Cir. 2024); *United States v. Hay*, 95 F.4th 1304, 1313–18 (10th Cir. 2024); *United States v. May-Shaw*, 955 F.3d 563, 567–69 (6th Cir. 2020). The First Circuit, however, split 3-3 on the issue with three judges finding a Fourth Amend-ment violation (but applying the good-faith exception) and three others coming to the opposite conclusion. *See United States v. Moore-Bush*, 36 F.4th 320 (1st Cir. 2022) (en banc) (per curiam). And

some state supreme courts have found a Fourth Amendment violation. *See People v. Tafoya*, 494 P.3d 613, 622–23 (Colo. 2021); *Commonwealth v. Mora*, 150 N.E.3d 297, 308–13 (Mass. 2020).

A pole camera placed on the corner of a public commercial intersection in a large city may not trigger Fourth Amendment protections. But the Fourth Amendment might be implicated if such a camera records what goes on around a home for a long period of time. *See, e.g., Moore-Bush*, 36 F.4th at 336 (Barron, C.J., concurring) ("No casual observer who is merely passing by can observe (let alone instantly recall and present for others to observe) the aggregate of the months of moments between relatives, spouses, partners, and friends that uniquely occur in front of one's home."); *United States v. Cuevas-Sanchez*, 821 F.2d 248, 251 (5th Cir. 1987) (holding that the use of a pole camera, which overlooked a 10-foot fence and surveilled the backyard of the defendant's residence for a period of 55 days, constituted a Fourth Amendment search: "[A] camera monitoring all of a person's backyard activities . . . provokes an immediate negative visceral reaction: indiscriminate video surveillance raises the spectre of the Orwellian state. Here . . . the government's intrusion is not minimal. It is not a one-time overhead flight or a glance over the fence by a passer-by. Here the government placed a video camera that allowed them to record all activity in Cuevas's backyard.") (footnote omitted).

The majority, citing the Sixth Circuit's decision in *United States v. Houston*, 813 F.3d 282, 288 (6th Cir. 2016), reasons that the concern about long-term surveillance is not of constitutional

magnitude here.  As it sees things, the government could have stationed agents around the clock to observe Mr. Williamson's home, and nothing in the Fourth Amendment prevents the government from using modern technology to carry out its investigations more efficiently.

I would urge caution before assuming that the Fourth Amendment's public view doctrine, *see California v. Ciaraolo*, 476 U.S. 207, 213–14 (1986), constitutionally immunizes pole cameras regardless of the length of time they record nearby human activities.  Not too long ago, we applied another long-standing Fourth Amendment doctrine (the third-party doctrine) to reject a claim by a defendant that the government had unlawfully obtained his cell-site location information from a wireless carrier without a warrant. *See United States v. Davis*, 785 F.3d 498, 511–13 (11th Cir. 2015) (en banc).  Shortly thereafter, however, the Supreme Court rejected our approach and our conclusion.  It declined to apply the third-party doctrine and held that the acquisition of such information constituted a search under the Fourth Amendment, thus requiring a warrant.  *See Carpenter*, 585 U.S. at 309–16.  We simply do not know, and cannot accurately predict, how the Supreme Court will deal with the use of long-term pole cameras (or other similar means of video surveillance) and their impact on privacy, particularly in light of the current debate about the so-called "mosaic" theory of the Fourth Amendment.  *See, e.g.,* Orin Kerr, *The Mosaic Theory of the Fourth Amendment*, 111 Mich. L. Rev. 311, 346–52 (2012) (arguing against the theory).

Maybe the Supreme Court will conclude, as some have suggested, that current Fourth Amendment doctrine is simply not equipped to deal with the challenges of long-term surveillance in the digital age and will announce a new paradigm. *Cf.* Matthew Tokson, *Telephone Pole Cameras Under Fourth Amendment Law*, 83 Ohio St. L.J. 977, 1001 (2022) (asserting that "*Katz*'s usefulness as a forward-looking test, at least for difficult questions, is negligible," but positing that the "*Carpenter* test is a real standard, with teeth"). Time will tell.